Will the clerk please call the last case of the morning? Our last case today is 5-14-0535 Freeburg Community School District 70 v. James Tomah consolidated with 5-15-0053 W.C. and 5-15-0054 W.C. James Tomah v. Freeburg Community School District 70. For Freeburg, we have Eric Hubbard and for James Tomah, James Heath. Counsel, you may proceed. Thank you, Your Honor. Please report, Counsel. Your Honors, we are dealing here with actually three cases that were tried together. They were consolidated. They concern three distinct injuries. The first occurring on July 10, 2006. The second allegedly occurring November 7, 2008. And the third, May 7, 2010. Here, I represent, as I indicated, the respondents appellant to Freeburg Community School District 70. And we've appealed the decision of the third of the three injuries. This injury occurred while, or allegedly occurred, while the claimant was emptying a bucket of chemicals while at work. Is this the May 7th injury, or which one? This is the May 7th, 2010 injury, Your Honor. Your Honors, the utterly decisive point that I want to stress right out of the gate is that the Commission, in trying all three of these cases together, correctly found that the employee demonstrated a significant lack of credibility, time and again, in a number of different respects. And this lack of credibility served as the basis for denying the first two of the three claims. And I think it's, everything factually being somewhat intertwined, it's necessary to look at the extent of the lack of credibility that the arbitrator found. Wait a minute, isn't that a slippery slope? I think where you're going is, okay, the lack of credibility weighed against the claimant and the findings and the denial of the other claims. But on this claim, because there's a general lack of credibility, the Commission doesn't know that? And they erroneously found him credible on the third? What are you saying? Well, I think that it's the totality of the evidence. There's evidence in the third claim as well of a lack of credibility. But I think when you look at the mosaic of the evidence as it came in, it's tough to cherry pick. Well, there's a difference here, though, isn't there, on the May 7, 2010. I mean, they found him not credible on the first accident because, for one main reason, his coworkers did not corroborate that there was an accident. That's correct. However, on this last one that was found compensable, coworkers did corroborate that he called out and said he hurt his back. He was, in fact, removed from the scene by ambulance. So it's a different kind of scenario than the first discrete accident where coworkers said, we don't remember anything about it. He didn't seek medical treatment right away. So it seems pretty kind of logical, doesn't it, that the arbitrator and then the commission would say, as to these first two, we have a credibility problem. But on this last one, immediate medical treatment, corroboration by coworkers, we can't really say that that's not credible. Well, I think, again, you can't view it in a vacuum. You have to look at his credibility in the three cases as a whole. But I think there are similarities between the first injury and the third injury. They were both unwitnessed. The third injury, in the first injury, there were two employees working with him at the time of the alleged injury, neither of which recalled the injury happening, but there was a third employee who saw him directly after who corroborated his testimony as to the occurrence. That same coworker, I believe, was involved in the third injury as well, but came in, I believe, with another worker, if I'm correct, Your Honor, and heard his cries and discussed or saw that he had allegedly been injured. But, again, there are actually, from a credibility standpoint, again, if somebody reaches a point of critical mass in their lack of credibility, I think it necessarily has to call in their credibility as to, I mean, again, how do you cherry pick? What rule are you going in? You have a high hurdle here because, as an experienced practitioner, you know the law is well settled. Credibility matters are exclusively within the province of the commission. So how can you say they can't cherry pick credibility on each individual claim? Why not? What rule says they can't? Your Honor, there is no rule that says that specifically. I grant you that. However, I think when you look at, when you look, again, and I hate to keep going back to the mosaic of the evidence, but you have to reach a point where you have to question his credibility across the board. That argument, a claimant testifies that he's worked for a company for 25 years. He testifies that his job at the company is making widgets. And he says that on a given day there was an unwitnessed accident when such and such a thing happened. And the commission says, we don't believe you that an accident happened on that day. Does that mean they also have to disbelieve he worked for the company for 25 years or that he assembled widgets? Well, I think there's a difference between background information and information he's provided. Well, but your thesis is if he's untruthful on one thing, that he has to be untruthful on everything. Well, I think it calls his credibility into question so significantly that you have to question his credibility reasonably as to all occurrences of injury. Maybe we should do this. Can we assume that your credibility argument, and I'm not going to prejudge it, may not carry the day? So do you have another basis for attacking your work? Your Honor, that's exactly what I'd like to touch on before I get into trouble with the lights here. When you look at the evidence surrounding the May 7, 2010 injury, there is no evidence, even assuming that the credibility issue, as you said, we get past, that that was anything more than a temporary aggravation of his thoracic spine issue. Going back as far as 2001, the record actually goes back to 1999, I believe, experiencing thoracic pain. In 2001, he was experiencing 7 out of 10 on the pain scale, thoracic pain. He has a consistent history of medical treatment, thoracic pain going forward from 2001 up to the alleged 2006 injury, and then it continues on with what he characterizes, and again, he characterizes it inconsistently, but if there is anything consistent, it is that he continues to have this thoracic pain. After the alleged May 7, 2010 injury, five days later, he goes and sees Dr. Keeney. He doesn't mention this injury at all. He indicates that his pain is the same, and what can be very reasonably inferred there is he means it is the same as it was the last time I was here, which was in April of 2010, several weeks before. So his pain, based on that, and the next visit to Dr. Keeney a couple weeks later in May, he again said, or he again did not say anything about a May injury, May 7, 2010 injury. He then went and saw Dr. Tom, explained the history of injury going back to 2006, gave no history, or there's no history in his record, so again, you can reasonably assume he did not give that history to the doctor, gave no history to Dr. Tom of a May 7, 2010 injury. He... What difference does that make if, I mean, you're arguing that there wasn't an injury on that day? The difference, well, the difference it makes is to whether or not there was not an injury or whether... Whether he reported it to his doctors. Well, my point here is... Are you still arguing, you're still arguing that there was no accident? No, Your Honor, I'm past that. That's what I'm trying to figure out. I mean, if we're looking at causation, I mean, Gornet established causation. Dr. Gornet said that the May 7, 2010 accident aggravated his condition and in fact opined that he was permanently and totally disabled. And that was based on an erroneous history, which I would like to touch on in just a moment, but my point being is that if there was an injury, an aggravation on May 7, 2010, that he returned to his baseline shortly thereafter because... But Gornet's kitchen said that, but not Gornet. So there's a conflict in medical opinion. There is a conflict in medical opinion, but Dr. Gornet's opinion is based on significantly flawed medical history. Dr. Gornet thought he did not return to work after the injury of May 7 because his pain was too severe. In fact, he returned after May 7 with the same restrictions he was on before May 7. He was on restrictions prior to that. There were no new restrictions. He worked for several months before going out in August when additional restrictions were placed on him in early August, several months after the alleged injury. Then in late August, on the 28th of August, 2010, he goes to the emergency room at Barnes Hospital experiencing severe thoracic pain. He gives a history of having a week prior 7 out of 10 on the pain scale as his baseline was going back as far as 2001. And it increased that week to 9 out of 10, and that precipitated his visit to the hospital. So I think the evidence establishes, and I want to get to Dr. Gornet next, the evidence establishes when you look at it in that light, if he had an injury on May 7, it was an aggravation, it was a flare-up, it was temporary. He returned to his baseline, roughly 7 out of 10 pain. And then he had some episode in August 28, or the days leading up to it, of 2010, that caused a severe sort of aggravation to his pain. He denied that was a work injury. He denied trauma. He didn't give a cause for it. But going to Dr. Gornet, Dr. Gornet, again, he testified that it was his impression that the pain was so severe that Klayman did not return to work after May 7, which was wrong. He returned on the 11th, injury being on the 7th, back to work on the 11th. He also testified that if the employee, if Klayman told other doctors that his condition was the same as it had been prior to the May 7, 2010 accident, that that would be inconsistent with his understanding of the patient's condition. He did say that to Dr. Keeney five days later. When asked, he said, my pain is the same. So, of course, then Dr. Gornet was asked a couple of different ways. If the history given to him by Klayman was erroneous, would his opinion of causation potentially change to which he responded it would? So I think when you look, oh, and another thing importantly that I want to point out with Dr. Gornet, Dr. Gornet saw no additional or no new pathology following the May 7, 2010 episode. So I think it's eminently reasonable to conclude based on the fact that the only medical provider that is giving an opinion of causation is basing it on a severely erroneous history provided by the Klayman. When you look at that and then you look at Dr. Kitchen's report, our IND doctor, I think it's fair to conclude that, if anything, the May 7 injury or the May 7 aggravation, again, was temporary and Klayman went back to his baseline shortly thereafter and had some other episode the following precipitating the August 28, 2010 visit to Barnes. So, again, Your Honors, viewing it as the totality of the evidence, I think it's fair to conclude that if in fact any accident did happen, which again I'd hearken back specifically to the Chicago Messenger Service case, which says the testimony under oath and subject to cross-examination is a benchmark of credibility and if you fall short of that, then you have no credibility. As a historian, Klayman is all over the place on his medical history, but, again, the only medical opinion of causation is from Dr. Cornett based on an erroneous, flawed history. Therefore, on that basis, I would respectfully suggest that if an accident did happen at all, if it was a temporary aggravation, that the Klayman return to his baseline shortly thereafter and that his condition as it is being currently is not related to the May 17, 2010 accident. Thank you. Thank you, Counsel. You'll have time to talk. Counsel, you may respond. Thank you, Your Honor. May I please report? Jim Heath on behalf of Mr. Thoma, Mr. Hubbard. I'll get right to the causation issue on 5-7-10 because I think that's what the focus of your questions were. This last accident on 5-7-10 was the straw that broke the camel's back, so to speak. We had a worsening of symptoms. We had treatment at additional levels above and below the operated level in the thoracic spine. We had new medications prescribed by Dr. Tom, the pain management physician, and probably most importantly, we had a worsening of the work restrictions, which is exactly the reason why the employer could no longer accommodate. I think all that evidence in the record supports the commission decision, and it's sufficient evidence in the record to support the commission decision, that this accident of 5-7-10 was at least a cause in worsening Mr. Thoma's back condition, resulted in the need for more treatment, the need for worsening of restrictions that they ultimately did not accommodate. He has the event starting first with the symptoms. He goes to the ER. He's got now pain in his chest, his neck, shoulder blades. He's having weakness that he had never reported before. Is there any real issue about whether the accident happened? The opposing counsel seemed to say, well, because he has a general history of lack of credibility, how do we know this accident really happened? Well, I think that there's more than sufficient evidence in the record to affirm that the accident happened. Reported right away. Ambulance comes to the school. It was of such significance that the treating surgeon ordered an X-ray to check the status of the fusion that was already done. So I think that chronology in and of itself, on top of P.J. Gail's testimony. Corroborates the claim. Exactly. Gail testified that she heard it happen. Correct. So I think that there is more than sufficient evidence in the record to sustain the finding on accident. And the same on causation. Because, again, as I was talking about, the change in symptoms was significant enough that Sprick, the treating surgeon that performed the fusion in the thoracic spine, he had to order an X-ray. And it was then of such significance that he referred him to pain management. The pain management physician, Dr. Tom, he had to change medications. He included some Baltan gabapentin, which he had never been on before. He injected levels of T45 and T89, which were not addressed at the time of surgery. In fact, at the time of surgery, T89 was negative on the disco brain. So something led Dr. Tom to believe that now was the symptomatic level. Similarly, when Mr. Tomas saw Dr. Gornet, he referred Mr. Toma for additional injections. And Dr. Boutreau, again, she injected, I believe, T45 and T89 again. And Gornet's point in his deposition was, look, this doesn't necessarily cause a new disc herniation, but it at a minimum aggravated other discs and caused that cellular inflammatory response. And he got that based upon, again, the patient's history, that it was worse, which is totally consistent with having to treat additional levels and ultimately worsening the restrictions that the employer wouldn't accommodate. So I think all those factors give the commission a sufficient basis to find that there was an aggravation and a worsening of the condition. Thank you, counsel. Counsel, you may respond. Thank you, Dr. Garnett. First of all, speaking to the T8, T9 issue with the discogram, the discogram that was proved back several years before the 2010 injury showed negative as to that level. However, it was shown it was herniated back as far as 2008. There was a herniation of T8, T9 as far as T11, T12, T4 and 5 and T5 and 6 possible. So there was an injury or at least a herniation reported at that time. And, again, I'd stress that even Klayman's own IME doctor said there was no new pathology following the May 7 incident. I think when you look at the symptoms, the symptoms, again, a worsening of symptoms, when you look at the mosaic of evidence going back to that term, going back to 2001, the symptoms are pretty severe. They ebb and flow, but there's pain that's going up in the upper reaches of the pain scale. Going back as far as 2001, he had surgery in 2009 to fuse the T11, T12 and have a cage put around it. He'd been having very significant problems well before the 2010 incident. So I don't think that in and of itself is sufficient to establish that the May 7, 2010 occurrence is the cause of his current condition of ill-being. Again, I think it was, if anything, a temporary aggravation that subsided. The new work restrictions, which were referenced, I believe didn't occur until early August of 2010. That's several months after the May accident. So the work restrictions immediately following the May 7 incident, when he was discharged from the hospital in light of his complaints and in light of their findings, no new work restrictions were placed on him, nor were they from May 8, 2010 until August 2, 2010. So on that basis, again, we would respectfully suggest that the incident serves nothing more than an aggravation that subsided and claimant returned to his baseline. Thank you very much. Thank you, counsel, both for your arguments in this matter. You will be taken under advisement that this position is issued. The court will now stand in recess subject to call. They didn't argue. They didn't argue. No, no. I didn't know. Well, it was consolidated. We never expanded time. Did we ever expand the time? No. No. They were consolidated for argument. Nobody talked about the other side. Nobody talked about it. Go right ahead. Normally, you would ask for additional time. Yeah, there was no. You realized with the first call case. You don't think you're going to get a half hour in each of the other cases. We were not going to take a half hour each time. Yeah, each of the other two cases. Okay, what we'll do is kind of five minutes each party. Okay. Thank you, Your Honor. All right. Very good. I assume you'd like to proceed? Yes. All right. Your Honor, I want to start very quickly with the 11708 repetitive trauma claim. That's when my client saw Dr. Sprick the first time. He noted that his work activities, in particular those large folding tables that we all remember from cafeterias, aggravated certainly his symptoms in his mid-back. Every witness that testified in this hearing agreed not only did my client lift those tables all the time for basically his entire employment as a custodian, but also that he also reported problems with this all the time, and that was corroborated in the medical records long before he ever claimed any type of work injury, and I put those pages in my appendix. So my point is that there was really no evidence in the record to support the commission's decision that there's not an accident with respect to repetitive lifting heavy tables among file cabinets at work. Didn't they kind of point out, and I think it's true in the medical records, he always referred back to what I'll call the first specific accident? Yes, sir. In other words, when he went to the doctors, he didn't say, I'm always lifting tables. He said, I got hurt with the playground equipment. Correct. And my back's been bothering me ever since. That's what he told the doctors. He absolutely did, and he even mentioned back in 2004, 2005, 2003, that the tables were giving him back problems which necessitated the therapy, but he didn't ever file a claim. It didn't really become an issue. So my only point is, to what extent these tables contributed to the need for immediate treatment or anything, I mean, I think that's something that would have to remain to task the commission. But in terms of the activity itself, and Dr. Sprick noting that as an aggravating factor, there's just nothing contrary. There absolutely was preexisting. There's a lot of other causes for what was going on with his back, but at least as a contributing factor. Regarding the event claimed on 7-10-06, I think everybody agrees they were assembling playground equipment on July 6th. I think everybody would probably agree that if you hurt your back assembling playground equipment as an employee, that's probably a risk incidental to your employment. The question is here, did it actually happen? The two co-workers admittedly, they said, we don't remember it. I think that really has to do more with notice as to whether or not it happened, because no one found P.J. Gale not credible. She said, look, he was on the ground. He was crying. That was a very memorable moment. Alls Havell and Wes Lantern, I believe, said, I just don't remember it. Well, my client didn't say that I made a big deal of it when it happened. He said, I mentioned it. I went inside. So in that context, I just don't know that you can say that there is sufficient evidence to say that he was not a credible witness. It cuts both ways. You were smiling when you were grilling your opponent about the credibility to the individual case. Now you're basically asking us to say, well, even though they didn't find him credible, he is credible. I agree that they can find him credible about one thing and not the other. I'm saying the explanation that the commission gave for giving him credible in this one, I don't believe that that's necessarily supported by the record. I think the issues of telling Havell and Lantern really have to do more with notice than action. So that's really what I'm getting at here is that if you accept Gail's testimony, which the commission never said we don't believe her, and then you look at how it's just documented in almost every single medical record, even before he knew what Tom was or filed a claim. I mean, he always said, July of 2006, my back locked up. And again, that's not a causation argument. I think there's more than sufficient evidence to support that there was an accident. In terms of causation, that's something else the commission would have to address. Thank you, counsel. Counsel, you may respond. Thank you, Your Honor. First of all, the issue here that was working against me when I was up here last time is not working in your favor? Well, a finding of fact, well established, is against the manifest way to the evidence only where an opposite conclusion is clearly apparent. Or as the United Airlines case I cite says, put another way, the commission's determination on a question of fact is against the manifest way to the evidence only when no rational trier of fact could have agreed with, in this case, the arbitrator. Here, the arbitrator said that his lack of credibility stemmed from several things. First, his demeanor while testifying. Second, the contradicting testimony, not just of the two co-workers who were standing with him when he allegedly injured himself and recalled nothing at all, but also the nurse, Robin Skaier, who he reported, he testified he reported this injury to, and that she told him, I don't have any accident forms, basically, to go away. She completely denied any of that ever happened. So her testimony, the testimony of the two co-workers, and then also the arbitrator said the contradictory information that he provided to medical providers, such as denying ever injuring his back, doing anything off the job, when it is very clear that there's a chiropractic health clinic note from July of 2001 where he said he hurt his thoracic spine when he fell off a motorcycle the day before. So his credibility that destroyed him essentially in the first two cases, the question is, were these inconsistencies sufficient enough to support the finding of the arbitrator? They clearly are. Again, going back to the old adage, you can't substitute your judgment for that of the finder of fact. A reasonable trier of fact, admittedly, may draw another conclusion out of the totality of the evidence, but here there is more than sufficient evidence to support the finding in the first two cases of no causation. As to the second case, the repetitive trauma case, she also, the arbitrator also, cited the same factors, his lack of credibility for her denial of that claim, but she also got into the issue of, he's already proclaimed this to be a definable injury that happened in 2006, and then he turns around and says it's also a repetitive trauma, her point being you can't really have it both ways, it's either a fish or a fowl, either it's a repetitive trauma or you injured it in your alleged July of 2006 injury. So she referred to it as nebulous both factually and I believe legally as well, and I think that's the right decision for that claim, as well as the first one. So on that basis, we would ask that the holding of the commission as to the first two cases be affirmed. Thank you very much. Again, thank you, counsel, for your arguments in those remaining cases. The court will take all of those three cases under advisement. Written disposition will issue as to each. Now we will stand and recess, subject to call.